## UNITED STATES v. KRAW.

### No. 10434.

United States Court of Appeals
Seventh Circuit.

Jan. 18, 1952.

Francis Borrelli, Chicago, Ill. for appellant.

Otto Kerner, Jr., U. S. Atty., Charles V. Kralovec, Asst. U. S. Atty. Chicago, Ill. for appellee.

Before DUFFY, FINNEGAN and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This is an appeal from a judgment of the District Court finding the defendant, Charles S. Kraw, guilty and sentencing him to imprisonment for two years on a charge of violating 18 U.S.C.A. § 659 by knowingly receiving goods stolen while moving as an interstate shipment. The stolen property here involved was the same ice cube maker and storage cabinet involved in our Cases No. 10382 and No. 10432, in which John Williams and Nick Rogulich, respectively, were the defendants. U.S. v. Williams, 7 Cir., 194 F.2d 72.

Williams, Rogulich and Michael J. Diorio were charged jointly with the defendant Kraw in the second count of the indictment. The defendant Kraw was granted a severance and was not tried until after Williams and Rogulich had been tried and convicted. After the conviction of Kraw the Government dismissed the charge against Diorio.

In this opinion we shall not repeat all of the detailed facts recited in the Williams and Rogulich opinion but shall give only such facts as are necessary to an understanding of the situation as it relates to Kraw.

Kraw and Diorio entered into a partnership contract on August 29, 1949, for the purchase and operation of the Miami Lounge, located at 2822 West Garfield Boulevard (55th Street), Chicago, Illinois. This partnership was terminated June 5, 1950, when Diorio sold his interest to Mrs. Adams, a former wife of Kraw. In this case it was stipulated by and between the parties that the ice cube maker was moving as an interstate shipment; that the shipment arrived on the dock of the Dakota Transfer & Storage Company on January 13, 1950; and that the ice cube machine was stolen from their dock on January 14 or 15, 1950, by persons unknown. It was further stipulated that Kraw bought the machine from Williams on February 7, 1950, and placed it in the Miami Lounge. These stipulations left in the case only the question as to the sufficiency of the evidence to support the finding of Kraw's knowledge that the machine had been stolen.

Diorio, the confessed accomplice, testified that on or about February 26, 1950, Kraw told him that he, Kraw, had a good deal for an ice machine which he was going to buy from Williams for $400, and that at that time Kraw told Diorio that the machine was stolen. Diorio also testified that the next evening he and Kraw went out to the Cashman garage with Williams and Rogulich, loaded the machine onto a trailer attached to their car and brought it back to their tavern. This testimony by Diorio is the only direct testimony we have as to Kraw's guilty knowledge that the ice cube maker was stolen, but from Kraw's actions and from his conflicting and inconsistent statements we have circumstantial evidence from which the trial court could, and did, infer that Kraw knew when he bought the machine that it had been stolen.

Kraw told different stories on different occasions as to how he had come into possession of the machine. He told Goddard, the Carrier serviceman, that he bought

the ice cube maker as part of the fixtures of the Miami Lounge. He told Janke, of the Dakota Transfer & Storage Company, that he didn't know where the machine came from; that Diorio brought it to the tavern and that Diorio may have gotten it from a certain Joe or Johnny Williams. At another time, while being interviewed by the F. B. I. Agents Dennis and Stefansson, Kraw said that Diorio bought the machine from a man named Joe, whose last name and residence he (Kraw) did not know. In the same interview Kraw was shown a picture of a man and he identified it as a photograph of Williams but said that he was not the man from whom he bought the machine. In a written statement which Kraw signed and gave to Agent Dennis, Kraw said that, "Williams and another man delivered the machine to our lounge." Finally, on his cross-examination in the trial of this case, Kraw admitted that Diorio's statement was true; that he (Kraw) and Diorio had gone out to the Cashman garage after the machine and had brought it back to their tavern on a trailer.

Kraw also told various stories as to his acquaintance with Williams. It is apparent from a consideration of all of the evidence that he knew Williams very well. Yet in some of his talks with the F. B. I. agents, Kraw seemed to be trying to lead them to believe that he was not acquainted with Williams at all. Kraw told various and conflicting stories as to how many times Williams had been in the Miami Lounge, as to what Williams' first name was and as to where Williams lived. And, as we pointed out above, after identifying the picture of Williams, Kraw told the F. B. I. men that Williams was not the man he bought the ice machine from.

Kraw also seemed to be trying to convince the F. B. I. and the court that Diorio was the one who had had all of the dealings with Williams; yet he signed a written statement describing the transaction in which he said, speaking of Williams: "* * * He told me he wanted Five Hundred Dollars for it and he said it was worth about One Thousand Dollars or more. I offered him Four Hundred Dollars. * * * I gave Williams One Hundred and Fifty Dollars when he delivered the machine. This was by check payable to cash. * * * The ice cube machine I bought from Williams is the same one which I had serviced by the Carrier Corp. * * *" (Our emphasis.)

As to the price Kraw paid for the machine, he told the investigators and the court that he paid $450 for it, yet his books showed a payment of only $400.

When Kraw was asked to bring in his books and cancelled checks covering the period during which the purchase of this machine was made, he failed to bring in the two cancelled checks that had been given to Williams in payment for the machine. Later it was disclosed that Kraw knew all the time where the two checks were. The manner in which these two checks were made out—one to "Cash" and the other to Diorio and endorsed by Diorio —would tend to throw suspicion on the transaction.

It was also significant that Kraw received from Williams neither a receipt for the payment to Williams nor a bill of sale for the machine. Yet when Kraw paid Janke of the Dakota Transfer Company for the machine, he required Janke to give him a receipt for the amount paid, which receipt stated that it was "in full payment of purchase price of 1 Carrier Ice Cube Machine and Cabinet, Serial No. 01009." This receipt also stated that the "Order Bill of Lading (is) to be stapled to check so that it becomes property of Miami Lounge upon proper clearnace (clearance) of Check thru Marquette National Bank, Chicago, Ill. Check #2416, payable to Dakota Transfer & Storage Co."

Counsel for the defendant stresses the fact that Kraw did not resist Janke's demand that Kraw either turn over the machine to him or pay the amount of the loss which the Dakota Transfer Company had been required to pay to the Carrier Corporation. The trial court might well have thought that Kraw paid Janke too readily; that the ordinary man, having bought any article in good faith and having paid therefor several hundred dollars,

would have demanded more proof than Kraw did that the property had actually been stolen. We think such an inference by the trial judge would have been reasonable.

When Diorio wrote out the two checks for Williams he wrote Williams' name as the payee on the check stubs. At some later time the name of Williams on these stubs was blotted out with ink. Both Diorio and Kraw denied doing this. They were the only two, however, having access to the check stubs who would have had any reason for doing it. Diorio sold out his interest in the partnership in June 1950, almost a month before it became apparent that they were going to have any trouble about the ice cube machine. After Janke made his demand for the machine or money in payment, these check stubs were available only to Kraw.

Counsel for the defendant contends that the fact that the serial number and the name plate on the machine were not mutilated tends to show a lack of guilty knowledge by Kraw. However, the defendant indicated to the F. B. I. agents that he did not know the machine had a serial number, and it would seem that the mutilation of the name plate on the front of the machine would be more apt to call attention to the machine than would the name. Defendant's counsel also insists that the fact that this machine was in the kitchen of the tavern, and not concealed, and that the defendant willingly showed it to Janke tends further to prove a lack of guilty knowledge by Kraw. Janke testified, however, that he had told Kraw that he had already seen the ice cube machine in the lounge when Kraw volunteered to take him back to the kitchen and show him the machine.

Kraw's counsel credits him with trying to cooperate with and help the Government in its prosecution of Williams. This claim is not substantiated by the record. Kraw withheld the checks. He withheld the truth as to how he acquired the property and he withheld the true identity and address of the person from whom he acquired the property.

In this case the defendant again questions the value of the testimony of Diorio, a self-confessed accomplice. It seems clear, however, that Diorio's testimony that Kraw had the necessary guilty knowledge is corroborated by the conflicting and inconsistent stories which Kraw told throughout this investigation and trial and by the surrounding circumstances. This record is replete with evidence to sustain the finding by the trial court that Kraw knew that the ice cube machine had been stolen.

We agree with the trial judge that "it really does not make any difference whether Diorio was the principal negotiator in the purchase of this machine or whether it was Kraw. It may well be that Diorio has presented the picture that would be most favorable to himself, * * *." The statute penalizes anyone who receives stolen goods knowing them to be stolen, not just the ring leader. Even if the trial judge believed Kraw's story that Diorio actually was the instigator of their purchase, the circumstances were such that he could, and did, find that Kraw went along with Diorio knowing that he was receiving stolen goods. The trial judge drew this inference from the circumstances and announced his finding *before* he was apprized of Kraw's previous criminal record.

The judgment of the District Court is affirmed.